IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

ENTERED
09/29/2010

| | | |
|---|---|---|
| IN RE: | § | |
| ASPEN EXPLORATION INC | § | CASE NO: 08-50325 |
| Debtor(s) | § | |
| | § | CHAPTER  7 |
| | § | |
| THOMAS A. PRICE, *et al* | § | |
| Plaintiff(s) | § | |
| | § | |
| VS. | § | ADVERSARY NO. 09-5009 |
| | § | |
| JANET S. NORTHRUP | § | |
| Defendant(s) | § | |

## <u>MEMORANDUM OPINION</u>

Plaintiff is a joint venture that paid $33 million to Aspen Exploration, Inc. ("Debtor") with the expectation that Debtor would drill an oil and gas well and then, if the well was successful, Debtor would transfer ownership of that well to Plaintiff. Debtor did indeed drill a well, but there is no documentation evidencing a transfer of the well to Plaintiffs. Plaintiff admits that Debtor holds record title to the well. But Plaintiff asserts that it owns equitable title (i) because the solicitation materials for investment in the joint venture Debtor promised to transfer ownership of a well to Plaintiff if a well was drilled successfully, and (ii) because Plaintiff allegedly paid for the well and therefore is the owner under the doctrine of constructive trust. Debtor's chapter 7 bankruptcy Trustee, Janet Northrup, is the Defendant. The Trustee contends that she holds both legal and equitable title to the well and, alternatively, that she has the right under Bankruptcy Code § 544 to avoid any interest that Plaintiff might hold. The documentation that solicited investments in the joint venture does not purport to be a contract translative of title to a well, and does not satisfy the statute of frauds in any event because it does not describe the property or refer to a document that does. In addition, there is no summary judgment evidence that Debtor used Plaintiff's funds to drill the well. The summary judgment evidence is that Parker Drilling Offshore USA, LLC ("Parker") was the entity that actually drilled the well, that Parker was not paid for the work, and that Parker has judgment liens against the well for nonpayment. The Court required the Trustee to join all of Plaintiff's equity owners as Third Party Defendants to assure due process to all parties. Most of Plaintiff's equity owners were dismissed when they filed disclaimers of interest; at least one investor has filed a response indicating that she does not know what she and her late husband purchased. Plaintiff and Defendant filed cross motions for summary judgment. By separate order issued this date, for reasons set forth below, the Court has granted partial summary judgment recognizing Defendant as owner of the well and dismissing all of Plaintiff's claims. Plaintiff has simply failed to provide any summary judgment evidence on critical elements of proof in its case, and therefore the Trustee is entitled to summary judgment.

*SUMMARY JUDGMENT EVIDENCE*

The summary judgment evidence submitted by all parties is essentially in accord.

In January, 2004, Wave Energy Corporation ("Wave") assigned to Aspen an interest in what is referred to as the Rancho Blanco Lease.  This assignment was recorded in Jim Hogg County and in Zapata County.

In December, 2005, Debtor sent a group of individuals (the "Prospective Investors") voluminous materials, (the "Offering Materials") including a Confidential Information Memorandum ("CI Memorandum"), a Questionnaire to qualify prospective investors, a proposed Joint Venture Agreement of Aspen Exploration, Inc. – Rancho Blanco State # 6 (A Texas Joint Venture), Execution Page and Power of Attorney, Fandango Field Development Project with related logs and geophysical data of related wells.[1]

The documents are marketing materials to solicit funds from the Prospective Investors for the purchase of equity interests in the RB6 JV.  The CI Memorandum merely describes the objective of the venture and the business plan; it does not purport to be a document translative of title to an oil well.  The solicitation materials state that:

> The investment objectives of the Joint Venture will be to (1) acquire an interest in the Prospect Well, (2) participate in operations thereon, if appropriate, (3) in its initial year(s) of operation, provide current tax benefits to the Venturers to offset income from any source (see "TAX ASPECTS") and (4) provide cash distributions to the Venturers (see "PROPOSED ACTIVITIES").  There can be no assurance that the Joint Venture's investment objectives will be achieved.

The business plan only vaguely describes "The Prospect Well":

> The entire Prospect containing the proposed drill site will consist of several oil and gas leases … in Jim Hogg and Zapata Counties in the State of Texas.  The Prospect Well will be drilled to a depth sufficient to test the T-1 through V-3 Sands of the Wilcox formation.

> **The Prospect Well**

> The following is a brief description of the leasehold interests that make up the Prospect and the manner of the proposed acquisition of the drilling acreage by the Venture.

> The Venture intends to acquire 74.17% Working Interests … in the Prospect Well …[not further defined]…The Prospect consists of several oil

---

[1] Plaintiff's motion for summary judgment, Exhibit B, docket # 150.  The geophysical data was not directly related to the well in dispute.  That well had not yet been spudded or drilled.

and gas leases, approximately 40 acres in Jim Hogg and Zapata Counties in the State of Texas.

The Operator has … selected an oil and gas drill site for exploration and development.  Prior to the commencement of additional drilling activities, however, the Operator may review additional geological and geophysical data, title information, and mineral history from other potential acreage and recommend that the Venture explore and develop such other drilling site in substitution for the drilling site described herein and in supporting documents furnished separately.

"PROSPECT" or "PROSPECTS" shall mean the oil, gas and mineral leasehold estate or estates, or undivided interest therein, and other contract rights and interests in oil, gas and minerals on which the drill site is proposed to be acquired pursuant to an assignment of the Lease.  Nothing herein shall prevent another venture or other entity organized by the Managing Venturer or any of its Affiliates from acquiring a prospect which, subsequent to such acquisition, is determined to be in the same geological reservoir as any Prospect owned by the Venture.

"PROSEPCT WELL" shall mean the initial test wells proposed to be drilled, tested and, if appropriate, Completed on the Prospect as a part of the Initial Operations.[2]

The most that one can glean from the CI Memorandum is that the Prospect Well will be located somewhere in one of two counties in Texas, on a lease obtained by Debtor.

Plaintiff argues that the exact location of the well can be determined from Railroad Commission records.  To that end, Plaintiff attached a drilling permit issued in September, 2005, that allows drilling of a "Rancho Blanco Corporation—State Gas Unit Well # 6."[3]  Plaintiff does not assert that the drilling permit was attached to the Solicitation Materials.  Plaintiff argues that although the Solicitation Materials do not identify the well with any specificity, the extrinsic Railroad Commission records are sufficient to create an issue of fact for trial because the specific property allegedly sold in the solicitation materials could be identified from those extrinsic records.

The drilling permit does not demonstrate an issue of fact for trial.  The drilling permit was not attached to the Solicitation Materials and does not refer to Railroad Commission records or any other extrinsic document from which Prospect Well could be identified.  And even if it did, the CI Memorandum gives Debtor the right to substitute another well at another location. The CI Memorandum also gives Debtor the right to create an affiliate that would share the Prospect and there is no way to tell which well(s) would belong to Plaintiff and which ones would belong to the affiliates.

---

[2] *See* Docket #150, Exhibit B, RB6 Memorandum at 12
[3] Plaintiff's summary judgment materials, Exhibit A.

Further, the Railroad Commission documents that Plaintiff attached indicate that the well was not spudded until July 12, 2006, some 7 months after the solicitation materials were issued. Until then, Debtor had the right to change its mind, to drill the well at a different location, to drill an affiliate well somewhere in the vicinity, or not to drill any well at all.

The geophysical information and development plan that Plaintiff attached as summary judgment material is likewise insufficient. What it shows is the other activity in the area. It does not identify a specific well or suggest that title to that well is transferred.

The CI Memorandum does not purport to transfer title. It states that Debtor, will "use its best efforts to have the appropriate title of the RB6 Mineral interest transferred to the Venture upon completion of the Prospect Well."[Emphasis supplied.][4]

Investors purchased 354 units in the RB6 JV for a total purchase price of approximately $37.5 million. Plaintiff's expert witness affidavit (submitted as part of its summary judgment evidence) states that the money went into the RB6 JV bank account and that RB6 JV then transferred $33 million to Debtor.[5] Plaintiff's expert witness states that Debtor spent the money. But the expert witness affidavit does not state that the witness can trace any funds from Debtor to the RB6 Prospect Well.[6] Plaintiff provides no tracing of funds from the RB6 JV to the Prospect Well.[7]

The only summary judgment evidence that traces the funds used to drill the Prospect Well is Parker Drilling's response to Plaintiff's motion for summary judgment.[8] Parker's memorandum states that it drilled the well and was never paid. Parker provides competent summary judgment evidence, including the judgment of a state court of competent jurisdiction and the deposition transcript of a deposition taken by Plaintiff.

INVOLUNTARY BANKRUPTCY, CONTEST OF TITLE, AND SUMMARY JUDGMENT

On November 17, 2008, an involuntary bankruptcy petition was filed against Aspen. An order for relief was entered and Janet Northrup was appointed Chapter 7 Trustee (the "Trustee"). The Trustee has been operating Aspen's business and administering the assets of the estate since March 30, 2009.[9]

In September 2009, a group of RB6 Well investors filed a complaint for trespass to try title against the Trustee, which initiated this adversary proceeding. The Trustee objected to standing, asserting that the investors could show no claim to the well. The investors were

---

[4] *See Id.* at 13-14.
[5] *See* Docket #150, Exhibit C, Affidavit of Jason Ferguson.
[6] *Id.* The affidavit states merely that after the money was deposited in Debtor's operating accounts, " … outgoing payments were then made."
[7] The expert attaches a list of deposits that the Court cannot interpret. The expert opinion affidavit however clearly does not support tracing.
[8] Docket # 152 and attachments.
[9] Docket #182, Case No. 08-50325.

dismissed but Plaintiff (the joint venture) was allowed to substitute as Plaintiff.  In July of 2010, Plaintiff filed its Second Amended Complaint.[10]

The Plaintiff and the Trustee have both filed motions for summary judgment.

The Trustee asserts that Aspen owns both the legal and equitable title to the RB6 Well, contending that, as a matter of law, the real property records and the Trustee's avoidance powers under 11 U.S.C. §544 defeat Plaintiff's claims.

Plaintiff concedes that Aspen holds "bare legal" title.  Plaintiff argues that it holds equitable title because (i) the CI Memorandum and associated documents constitute a contract for sale and Plaintiff fulfilled its obligation (*i.e.* it paid the purchase price), and (ii) the Debtor/Trustee holds the property in constructive trust.

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment should be granted "if the pleadings, the discovery, and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c); *Gray Law LLP v. Transcon. Ins. Co.*, 560 F.3d 361, 365 (5th Cir. 2009). Federal Rule of Bankruptcy Procedure 7056 incorporates Rule 56 in adversary proceedings.[11]

A party seeking summary judgment must demonstrate: (i) an absence of evidence to support the non-moving party's claims or (ii) an absence of a genuine issue of material fact. *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009); *Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006).  A genuine issue of material fact is one that could affect the outcome of the action or allow a reasonable fact finder to find in favor of the non-moving party. *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008) ("A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party."); *James v. Tex. Collin County*, 535 F.3d 365, 373 (5th Cir. 2008).  A court views the facts and evidence in the light most favorable to the non-moving party at all times.  *Campo v. Allstate Ins. Co.*, 562 F.3d 751, 754 (5th Cir. 2009); *LeMaire v. La. Dept. of Transp. & Dev.*, 480 F.3d 383, 387 (5th Cir. 2007). Nevertheless, a court is not obligated to search the record for the non-moving party's evidence. *Malacara v. Garber*, 353 F. 393, 405 (5th Cir. 2003).  The Court should not weigh the evidence

---

[10] Docket #144.

[11] Rule 56 was amended, effective December 1, 2007.  Although most changes were stylistic, the changes to Rule 56(c) were substantive.  Prior to the amendment, Rule 56(c) provided that the Court "shall" grant summary judgment if the relevant criteria were met.  Effective December 1, 2007, the word "shall" was changed to "should".  The Committee Notes to the 2007 amendment state that the word "[s]hould" was substituted for "shall" to recognize that, "although there is no discretion to enter summary judgment when there is a genuine issue as to any material fact, there is discretion to deny summary judgment when it appears that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56 advisory committee's notes (2007). As one commentator noted, "even when a motion for summary judgment is properly made and supported, it need not be granted . . . [s]uch a motion may be granted - indeed, it should be granted - but it does not have to be granted."  Bradley S. Shannon, *Should Summary Judgment Be Granted?*, 58 Am. U. L. Rev. 85, 95 (2008).

inasmuch as a credibility determination may not be part of the summary judgment analysis. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

"The moving party bears the burden of establishing that there are no genuine issues of material fact." *Norwegian Bulk Transp. A/S v. Int'l Marine Terminals P'ship*, 520 F.3d 409, 412 (5th Cir. 2008). The evidentiary support needed to meet the initial summary judgment burden depends on whether the movant bears the ultimate burden of proof at trial.

If the movant bears the burden of proof on an issue, a successful motion must present evidence that would entitle the movant to judgment at trial. *Malacara v. Garber*, 353 F.3d 393, 403 (5th Cir. 2003); *Chaplin v. Nationscredit Corp.*, 307 F.3d 368, 372 (5th Cir. 2002) (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)). Upon an adequate showing, the burden shifts to the non-moving party to establish a genuine issue of material fact. *Sossamon*, 560 F.3d at 326; *U.S. v. 92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008). The non-moving party has a duty to respond with specific evidence demonstrating a disputed fact issue. *Celotex Corp. Cattret*, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *92,203.00 in United States Currency*, 537 F.3d at 507. When identifying specific evidence in the record, the non-movant must "articulate the manner in which that evidence supports that party's claim." *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004); *Raga v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

If the movant does not bear the burden of proof, the movant must show the absence of sufficient evidence to support an essential element of the opposing party's claim. *Norwegian Bulk Transp. A/S*, 520 F.3d at 412; *Ballard v. Burton*, 444 F.3d 391, 396 (5th Cir. 2006). Movants who do not bear the ultimate burden of proof often seek summary judgment after discovery has produced insufficient evidence to support the non-moving party's claims. Upon an adequate showing of insufficient evidence, the non-movant must respond with sufficient evidence to support the challenged element of its case. *Celotex*, 477 U.S. at 324. The non-movant must "go beyond the pleadings and designate specific facts in the record showing that there is a genuine issue" rather than relying on conclusory allegations. *Adams v. Travelrs Indem. Co.*, 465 F.3d 156, 163–64 (5th Cir. 2006); *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). Ultimately, the motion should be granted if the non-moving party cannot produce evidence to support an essential element of its claim. *Condrey v. Suntrust Bank of Ga.*, 431 F.3d 191, 197 (5th Cir. 2005).

*ANALYSIS OF THE MOTIONS FOR SUMMARY JUDGMENT AND RESPONSES*

A.      Contract for Sale

Plaintiff concedes that it must prove (i) an agreement to transfer, (ii) in writing, (iii) that sufficiently describes the land to be transferred, and (iv) that is signed by the person making the transfer.

Plaintiff has provided no summary judgment material of any written agreement to transfer any specific well. The Offering Materials are a solicitation for investment in the JV. The property allegedly sold did not exist when those materials were prepared, distributed, and

signed.  The documents did not articulate any present intention to transfer the Prospect Well.
The documents merely state that Debtor will "use its best efforts" to transfer title when, and if,
the well is drilled.  The Prospect Well was not definitively described; it was vaguely defined as
somewhere in two counties.  Debtor retained the right to drill at a different location and the right
to drill wells for its other affiliates on the same leases.

Plaintiff asserts that one can use extrinsic evidence to supply the missing detail.  The
Court agrees with the Trustee's authority that the use of extrinsic evidence is permissible only
when that evidence is present in the document that is the written agreement between the parties.
(*See* Docket # 166, The Trustee's Reply, ¶ 14; *citing Wilson v. Fisher,* 188 S.W.2d 150, 152
(Tex. 1945).  The Railroad Commission permit is not mentioned in the Offering Materials.
Even if it were, the reference would not be adequate because Debtor had the right to re-designate
the well in which Plaintiff was to purchase an interest.

B.      Constructive Trust

Plaintiff and Defendant agree that to establish that Debtor holds the well in constructive
trust, Plaintiff must show: (i) a breach of fiduciary relationship, or in the alternative, actual fraud,
(ii) unjust enrichment of the wrongdoer, and (iii) tracing of Plaintiff's funds to the well.

1.      Breach of Fiduciary Duty or Actual Fraud

Plaintiff alleges that Debtor, as manager of the joint venture, breached its fiduciary
obligations to the joint venture by failing to transfer title of the well to the joint venture.  Plaintiff
acknowledges that the CI Memorandum does not "require" Debtor to transfer title, but only
requires Debtor to use its best efforts to transfer title.  Nevertheless, Plaintiff alleges that because
Debtor was both the title owner of the well and the managing partner of the joint venture, Debtor
breached its fiduciary duty by failing to use its best efforts to compel itself to make the transfer.

The Court has heard seemingly endless testimony in 3 related bankruptcy cases
supporting allegations that members of the Rand family (who controlled Debtor and Wave
Energy) engaged in Ponzi schemes to defraud investors related to oil well drilling activities and
that criminal charges have been brought.  The transactions proposed in the Offering
Memorandum provide unparalleled opportunity for breach of fiduciary obligations.  The
Offering Memorandum makes that fact abundantly clear to potential investors.  The proposed
transactions also provide clear opportunity for actual fraud.  Debtor was the promoter of the
investment scheme, was the managing venturer of the joint venture, and was responsible for
drilling and operation of a Prospect Well.  All of the money went through Debtor's hands with
virtually no transparency or contemporaneous accountability.  And the joint venturers, after
being fully informed, agreed.  But it is beyond the scope of these motions for summary judgment
to decide whether Debtor, as joint venturer, breached fiduciary obligations to the joint venture
(by failing to compel itself to "use its best efforts" to assure transfer of title) or whether Debtor
simply defrauded the investors directly by selling them the blue sky.[12]

_____

[12] The ambiguity of Debtor's probable fraud is illustrated by a response to the motions for summary
judgment filed by LaRene Rohweinthe, document # 165.  In her response, Mr. Rohwein demonstrates that she really
did not know what she bought and is not sure how to assert her claim.  There are numerous "stipulations of no claim

2.      Unjust Enrichment

Also beyond what the Court intends to undertake in this memorandum is whether Debtor was unjustly enriched.  Someone was enriched, but Debtor was left with very few assets and very large debts.  Someone was probably enriched, but that was apparently someone other than Debtor.

3.      Tracing

What is straightforward and clear is that Plaintiffs have provided no summary judgment evidence tracing its $33 million to the RB6 well.  Plaintiff's expert, after forensic review, could only state that Plaintiff transferred $33 million to Debtor and that the money was paid out by Debtor.  There is no summary judgment evidence that the money was paid out for the RB6 well.  There is no tracing.

There is summary judgment evidence, from Parker Drilling, that Plaintiff's money did not go to the RB6 well.  As Parker's memorandum persuasively argues, the doctrine of constructive trust is an equitable remedy.  But application of the doctrine in this situation would deny equity to the entity (Parker) that drilled the well by awarding the well to Plaintiff, who cannot show that its investment is traceable to the well.  In another persuasive, but narrowly legal note, Parker notes that Plaintiff's only basis for asserting equitable title is that Aspen is the record holder of that title.  Parker argues that "Plaintiff cannot admit Aspen's ownership of the RB6 Well, but in the same proceeding, deny that Aspen had the ability to encumber the property."[13]

C.      The Trustee has the right to avoid any potential lien as a bonafide purchaser

Under 11 U.S.C. § 544(a)(3), a trustee has the right and power, as of the commencement of the case, to avoid any lien or transfer avoidable by a hypothetical purchaser of real property of the debtor.  *Gaudet v. Babin* (*In re Zelda*), 103 F.3d 1195, 1201 (5th Cir. 1997); *Anderson v. Connie* (*In re Anderson*), 203 F.3d 855, 864 (5th Cir. 2000); *Gomez v. Kamper Investments, LLC* (*In re Gomez*), 388 B.R. 279, 290-92 (Bankr. S.D. Tex. 2008).  The extent of a trustee's rights as a bona fide purchaser is measured by the substantive law of the state governing the property in question.  *In re Robertson,* 203 F.3d at 864 (*citing In re Zelda,* 103 F.3d at 1201; *In re Hamilton*, 125 F.3d at 298).

1.      The Trustee's Strong Arm Powers are not trumped by Equitable Title Based on Contract for Sale.

11 U.S.C. § 541(d) provides, in relevant part:

---

to ownership" filed by similarly situated individuals.  The Court has little doubt that these unfortunate investors were defrauded, but they themselves do not know whether Debtor and its control persons defrauded them directly or whether Debtor breached a fiduciary obligation to the joint venture.
[13] Docket #152, page 3.

> Property in which the debtor holds as of the commencement of the case, only legal title and not an equitable interest… becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

11. U.S.C. § 541(d).

Plaintiff argues that the 5th Circuit in the *Haber* case held that the Trustee's powers under 11 U.S.C. § 544(a)(3) are trumped by 11 U.S.C. § 541(d).  *See Haber Oil Co. v. Swinehart (In re Haber Oil Co.)* 12 F.3d 426, 436 (5th Cir. 1994).  In *Haber,* the 5th Circuit agreed that a constructive trust[14] based on fraud or breach of fiduciary duty could, if proved, result in the defrauded party's successful claim to equity ownership of some asset of the debtor via application of 11 U.S.C. §541(d). *Id.*

But the *Haber* case is not applicable to the Plaintiff's claim of equitable title via "Contract of Sale."  As noted above, there is no document translative of title to that satisfies the statute of frauds.

Plaintiff also argues that the Fifth Circuit "unequivocally ruled" in *In re Quality Holstein Leasing*, that "the Bankruptcy Code clearly provides that if the Debtor has only bare legal title, and not equitable title, the RB6 Mineral Interest is NOT property of the estate." (Docket #150, page 19, *citing In re Quality Holstein Leasing,* 75 F.2d. 1009 (5th Cir. 1985).

But *Quality Holstein* is limited to property that a debtor holds as a trustee under a constructive trust.  *In re Quality Holstein Leasing* 752, F.2d at 1013-14 ("Where state law impresses property that a debtor holds with a constructive trust in favor of another, and the trust attaches prior to the petition date, the trust beneficiary normally may recover its equitable interest in the property through bankruptcy court proceedings.").  The Fifth Circuit was careful to limit its holding: "We emphasize that section 541(d) overcomes the trustee's section 544 powers only where state law confers equitable title on a third party effective prior to the commencement of the bankruptcy case." *Id.* at 1014.

As noted above, Plaintiff presented no summary judgment evidence tracing its funds to the well and Parker demonstrated that Plaintiff's funds did not pay for the well.

2.    Bankruptcy Code § 544

The Strong Arm powers of the trustee as a bona fide purchaser do not yield to all claims of equitable title under § 541(d).  *See, e.g. Wilson v. Parson (In re Jones)*, 77 B.R. 541, 543 (Bankr. N.D. Tex. 1987).  In *Jones*, the issue before the Court was "whether unrecorded oil and gas interests granted by a Debtor prior to bankruptcy are property of the estate, or property of the assignees." *Id.*  Strikingly similar to this case, the debtor would acquire oil and gas leases and

---

[14] "[T]he elements  of a constructive trust under Texas law is (1) breach of a fiduciary relationship, or, in the alternative, actual fraud, (2) unjust enrichment of the wrongdoer, and (3) tracing of the property to an identifiable res." *Haber Oil Co. v. Swinehart (In re Haber Oil Co.)*, 12 F.3d 426, 437 (5th Cir. 1994).

then induce investors to purchase working interests.  However, in *Jones,* the debtor actually transferred the interests to the investors.  *Id.*  The issue in *Jones* arose when those investors failed to record their interests.  The *Jones* investors made substantially the same argument presented by Plaintiff: "the Investors claim that they own an equitable interest in the leases while the Trustee holds bare legal title and thus the Investor's interests are not property of the bankruptcy estate pursuant to § 541(d)."  *Id.*

The *Jones* Court applied the Texas Recording Statute (TEX.PROP.CODE § 13.001) and *Quality Holstein. Id.*  In addition to concluding that *Quality Holstein* did not apply because the investors could not prove the existence of a constructive trust, The Court also surmised that "it is a basic premise of equity that one does not resort to it when law provides an adequate remedy."  *Id.* at 550.  These investors, like the investors in the *Jones* case still have a remedy:  as unsecured creditors, they may file a claim in the bankruptcy proceeding to recover their losses.

CONCLUSION

For reasons set forth above, by separate partial judgment, Plaintiff's motion for summary judgment is denied and the Trustee's motion for summary judgment is granted.

SIGNED 09/29/2010.

Wesley W. Steen
United States Bankruptcy Judge